Good morning, Your Honor. I'm John Clark. I represent the appellant, Geo-Energy Partners-1983 Ltd. Just to clarify a point, if it's not clear, we're not suggesting that the automatic elimination of leases under the unit agreement is not, is illegal. We're saying it's illegal. And the reason is, there are two reasons for that. One is the provision allowing for automatic elimination of leases is directly contradictory to the statutory language of the Section 1017 of the STEAM Act. And the second reason is, even if, in fact, the Court does not see this direct conflict, the purpose of the STEAM Act, and particularly the unitization provisions, would serve a substantial public purpose and would be thwarted by enforcement of the automatic contraction provisions of the unit agreement. Let me explain. The STEAM Act was enacted in 1970 to serve an important public purpose. The House Interior and Insular Affairs Committee indicated that the nation's geothermal resources promised to be a relatively pollution-free source of energy, and the development should be encouraged. Now, that public purpose was carried through to the original provisions for unitization under the STEAM Act, which provided that for the purpose of properly conserving the geothermal resource, the Secretary may either authorize or require unitization of leaseholds if doing so is necessary or advisable in the public interest. And then, in 1988, when the STEAM Act was amended, the Congress was a little more forceful in terms of how it wanted the Secretary to deal with unitization. It said that the Secretary must review a unit plan at least every five years and may eliminate leases only based on scientific evidence, and if elimination of the leases was for the purpose of properly managing and conserving the resource. By contrast, the unit agreement in this case provides for automatic elimination of units. Do you think the second provision eliminated the first? I'm sorry? The second provision of the STEAM Act? Do you think this new Act eliminated the contraction provision? Yes. And here's why. Why do you think that? Your Honor, if you take the unit agreement and you look at it structurally in terms of how it deals with contraction and expansion of units, it provides a section, and that's in section 4 of the unit agreement, it provides a section 4.1 that the Secretary may approve contractions or expansion of the unit boundaries from time to time. There's no specific period given. There's no specific criteria other than if the Secretary determines that to be in the public interest. When the STEAM Act was amended, it told the Secretary, no, that's not exactly what we want to do. We want to have the unit areas examined no less than every five years. And then in the ---- They never mentioned the old Act. In section ---- excuse me? They never mentioned it. They never said we're repealing the first way. Let's go to ---- no, we didn't. Not the Act, the agreement. Let's go to the section 4.3. Now, section 4.3 is the second aspect of this parallel comparison. Section 4.3 says that the unit agreement says that the Secretary basically provides for the Secretary to eliminate lands from the leaseholds automatically after four years after a participating area is discovered, irrespective of whether the purpose of unitization ---- irrespective of whether elimination of lands would ---- is for the proper conservation and management of the resource, or even if, as we believe in this case, elimination of lands from the unit disturbs that purpose. There is a direct conflict between the purpose of the Act, which requires elimination of units, only to serve the purposes of proper management and conservation of the public resource, versus this unit agreement, which was established a number of years earlier as a form by the BLM and its regulations that allows units to be ---- lands to be eliminated from units automatically, without consideration of whether it serves the purposes of the Act or it doesn't serve the purposes of the Act, and without respect to whether, in fact, unitization was required by the Secretary in the first instance or was sought by the parties, as, in fact, it was in this instance. And consequently, if you look at the agreement which preceded the 1988 amendments, the two provisions dealing with contraction and expansion, compare those to what Congress did in 1988. Congress basically said, no, Secretary, this is not what we want. We want units to be examined no less often than every five years. And we don't want leases to be eliminated automatically from units unless there's a finding that shows that they are ---- that elimination would be in furtherance of the public interest. And that's ---- Roberts. Well, you really kind of have to read between the lines to draw that strict interpretation of the Act, don't you? We think it's ---- I think it's, you know, you can read between the lines. You can see, well, what was going on in 1988? And granted, there's no congressional ---- there's no real record in the case that Congress's specific purpose was to eliminate the provisions of the way that the Secretary was dealing with units. But it seems fairly clear that one leads to the other. There are some footprints here, and we see the Secretary going off in one direction, and we see this Congress in response going off in another direction. Right. You may have footprints, but your position is that the Secretary is acting illegally here in approving a voluntary agreement which provides for automatic reduction. That's right. And that's a very different matter from saying, all right, well, we think Congress intended this, may have intended this, it may not. If we're into the May area, footprints were probably into the area where that decision is vested in the agency, aren't they? Well, Your Honor, I think that the answer in this circuit is, in terms of an agreement that is potentially or looks to be in conflict with a statute, and even if we're walking in between, going between the lines, reading between the lines, I think we can see there is a conflict between the way the statute is written and the way the agreement allows the Secretary to manage the unit. And there is a public ---- important public purpose in the statute. The Congress has made clear both at the time the statute was enacted and in its amendments to the provisions that it was seeking to promote a public purpose. If we say that, well, it's not a direct conflict, we still have to look at, I think, the tests under the United States v. Northrop. That's a Green-Keaton case that discusses the illegality or actually the enforceability of waivers. That case involved a waiver of a provision that precluded the plaintiff from bringing an action as a relater to the United States under the Keaton provisions. But the Court had a two-pronged test, and one was whether the ---- whether the contract waives a right or that is ---- impacts on the public interest. And I think by analogy what we're looking at is, does the contract allow the Secretary to ignore the direction of Congress in terms of eliminating leases and making decisions as to whether or not the elimination of a lease serves the public interest in terms of conserving the resource and properly managing the resource? And second is whether or not there's an important public interest that would be impaired by enforcement of the contract. In this case, the Secretary is certainly going to argue that, well, there is an important public interest in making sure that public lands that are dedicated to geothermal leases are explored and there's due diligence in terms of drilling and exploration. But that can be served in other ways. There's nothing in the STEAM Act that would have prevented the Secretary, who only several months before BLM made this decision, automatically eliminating the leaseholds from the process, the Department of Interior, BLM, from examining whether leaseholds, which were not apparently the subject of frequent drilling or exploratory drilling, whether or not those should have been eliminated at that time. The Secretary didn't do so. There was no reason why the Secretary couldn't have. All the Secretary had to do was say, hey, look, these leases, it doesn't look like you're going to be here. Why don't we take a look at this unit and see whether it really makes sense to keep these leaseholds in the unit? Is there scientific, any scientific evidence to keep them in or exclude them? They didn't look at that. You're in an odd situation, because this started as a contractual agreement, to which you're bound. Well, it's a contractual agreement. Interestingly, it's a contractual agreement where neither of the parties were particularly interested in enforcing this provision. But they agreed to it. Excuse me? But they agreed to it. They agreed to it a number of years earlier. I don't know the circumstances of why. So the parties are now saying, and I realize there's a change in the law, but the parties are now, or you're saying, look, I can't believe we entered into this agreement. It's illegal. I can't believe the Secretary's trying to enforce it. That's kind of where we are. But it was the agreement of the parties as to how this is going to be. Oh, and I think that's the case. And I don't think the parties under the presence of this circuit in any way can authorize by an agreement the Secretary to carry out what we believe is at least, we believe is clearly a violation of the STEAM Act, Section 1017, but at least is clearly contrary to at least the purposes of that provision, which are, Secretary, do what you want, but do so in furtherance of the public policy, which is to ensure proper conservation, proper management of the resource. That simply wasn't done. Why is it, do you think it's contradictory to the public policy of conservation by having an automatic reduction? I mean, the Secretary could well argue, look, we don't have enough resources to do a five-year review of all these, and therefore if there's an automatic provision that is contained in these contracts, we see nothing wrong with that. Well, the Secretary I don't think has a proper response to Congress to say that we don't have the resources, therefore we're going to make this elimination automatic, because we'll bless, if the parties agree to it, we'll bless it, and that's a means of effectuating the purpose of Congress and conserving the resource and ensuring drilling. Well, we don't know whether it's conserving the resource or not. That issue never entered into the question. There's nothing in the record at all, and certainly nothing in the decision contracting unit that explains or even suggests whether or not the elimination of the units is, the leases from the unit is in furtherance of this public policy of conservation and proper management of the resource, or it's the complete opposite. We think there's indications in the record that my client, Geothermal, really wanted to get to exploration. There were other issues that related to that, but that was an issue that never came into consideration. It may well be, and we think it was the case, that the automatic elimination of these leaseholds from the unit was contrary to the purpose of the STEAM Act. It basically prevented and interfered my client, Geoenergy Partners, once they were able to take control of the unit from engaging in exploration and engaging in drilling for the possible development not only of the, well, of potential geothermal resources in the unit that had not already been made commercial. That's the problem we see. It just wasn't part of the solution. We've got about two minutes left. Do you want to save some? I do. Very good. Thank you, counsel. Ms. Vance? May it please the Court. Holly Vance on behalf of Ken Salazar and Ronald Wanker. Your Honors, Article 4.3 does not violate Section 1017. Keep in mind that 4.3 focuses on the parties that are affiliated with unit operations. The purpose of the parties that are affiliated with unit operations. You're going to have to draw the mic a little closer. Sure, sure. I apologize. Remember, you've got Judge Hall who can only hear through the mic. Article 4.3 ensures that those parties develop the unit. In contrast, 1017 focuses on the land itself. That provision ensures that the land contains a sufficient amount of the geothermal resource. Keep in mind as well, Your Honors, that 4.3 applies five years after the participating areas formation, while 1017 applies five years after the unit agreements formation. The bottom line here, Your Honor, is these provisions are different, but they are completely compatible with one another, and they can run side by side. That's where the government disagrees with geoenergy's position. Turning to the contract itself, Your Honor. But theoretically, I suppose one could have an automatic reduction in acreage that would, in a particular circumstance, thwart the proper development and management. Wouldn't you agree? I'm sorry. Could you repeat the question? I mean, the scientific evidence or whatever technical evidence, if taken, would not support an automatic reduction, right? Well, Your Honor, I think they just, the provisions apply at different times and for different purposes. The revision in this case occurred in 2003, and the unit was evaluated based on scientific evidence at that time. Right. What I'm suggesting, and take it out of the facts of this case, is that let's say the review comes at a time that's somewhat coextensive. I mean, you could have a conflict between the automatic reduction provisions of a unit agreement and the scientific evidence, technical evidence that might be presented, right? I don't think so where the purposes are different. Well, let's say that the land, you have an automatic reduction. Well, proceed with your argument. I guess I don't understand why you say that an automatic reduction could never be contrary to the technical and scientific evidence that would be presented. Well, I suppose if they occurred at the same time. That's what I'm saying. Okay. But that's not what we have here. I know. Right. But we're talking about statutory construction. So if they occur at the same time, you have a reduction that's different from the scientific and technical evidence that might be presented at that time. Doesn't that indicate, perhaps, that the automatic reduction provisions are in conflict with the statutory provisions? Their argument is you have to do technical and scientific analysis regardless. Your argument is, no, they're different. And I'm saying, and you said they're different because it occurred at a separate time, but that's a coincidence in this case. Let's say they occur at the same time and with different results. Explain to me how the statute would work in that instance, or how the automatic reduction provision can comport with the statute. Well, in that instance, I do think the 1017 would take precedence, because if there's no scientific evidence at that point, then the unit would have to Well, BLM could not terminate the unit at that point. So what's the principal distinction, in terms of statutory analysis, between something that happens at the same time and something that happens at different time periods? Well, again, Your Honor, I just think that they are different  and they can run side-by-side, except for the scenario that you've presented. Go ahead. The only other point I want to make is I'd like you to keep in mind that geoenergy drilled only one well in the span of 21 years here, and I think that that, in and of itself, provides a basis for this Court to affirm. I would respectfully disagree with them that they were starting to make some headway as far as the development of this unit. If you take a look at their record, the Well, you would agree that there were a lot of extraneous factors that impeded the development of the resource here. There was a corporate fighting, division among partners. It's not the typical non-development case, if you would agree. I would agree, but all of the factors that played out to prevent the development of the resource had nothing to do with BLM. BLM is not responsible for overseeing the business operations of geoenergy. I understand that, but when you say, look, they've only drilled one well in all this time, so really you can affirm on that basis. There's more to the story than that. Well, there is, and I think it is issues unrelated to the conduct of BLM. They have taken the position that BLM has thwarted their efforts to develop the unit, and I think the record shows that it was factors other than BLM that resulted in any prevention of development of the unit. Do we have any further questions? All right. I think we have your argument. Thank you. Thank you. Mr. Clark. Thank you. Just very shortly, Your Honor. The timing of automatic contraction provisions and the unit review under Section 1017 don't have to be different. There's no reason why the Secretary, when it undertook the 1017 review in the 2002 period, couldn't at the same time have looked at whether or not elimination of leases. In fact, it was obligated to look and to see, determine whether or not elimination of leases would have been in furtherance of the act at that time. That was the purpose of that 1017 review. At that time, the Secretary did not eliminate any of the leases that are subject to this proceeding. So there is a ‑‑ it doesn't follow that automatic termination has to occur at a different time or there was a coincidence. What's important in this case, I think, is that, in fact, the Secretary did do the 1017 review. Apparently didn't determine any need to remove these leases from the unit. And then a few months later, the Secretary automatically eliminates the leases from the unit. Indicates to me that there is a conflict, that the Secretary did not make a determination, a conflict. In fact, the Secretary determined earlier that there was no need to determine to remove these leases from the unit. And now automatically is going to go ahead and do so. And I think that's a ‑‑ it indicates and shows that the elimination of units in this case wasn't necessary. In fact, may well have been contrary to the purposes of the STEAM Act. Okay. Thank you both for your arguments. The case is currently submitted.
judges: Hall, Noonan, Thomas